# In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 02-1247

BENJAMIN P. ENDRES, JR.,

*Plaintiff-Appellee*,

*and*

UNITED STATES OF AMERICA,

*Intervening Plaintiff-Appellee*,

*v.*

INDIANA STATE POLICE,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for the
Northern District of Indiana, South Bend Division.
No. 3:01-CV-0518—**Robert L. Miller, Jr.**, *Chief Judge*.

_____

ARGUED NOVEMBER 1, 2002—DECIDED JUNE 27, 2003
ON PETITION FOR REHEARING—DECIDED NOVEMBER 19, 2003

_____

This appeal originally was consolidated with No. 02-1377, *Holmes v. Marion County Office of Family and Children*, and the two appeals were decided in a single opinion, which is reported at 334 F.3d 618 (7th Cir. 2003). In response to the petition for rehearing and rehearing en banc, the court has decided to de-consolidate the appeals and to issue a separate opinion in each. The panel's opinion resolving this appeal follows.

All members of the panel have voted to deny the petition for rehearing. A judge in active service called for a vote on the petition for rehearing en banc. A majority did not favor rehearing, so the petition is denied. Judges Ripple, Rovner, and Williams voted to grant rehearing en banc. Judge Ripple has written a dissenting opinion (joined by Judges Rovner and Williams) that immediately follows the panel's new opinion.

Before BAUER, POSNER, and EASTERBROOK, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* Benjamin Endres lost his job with the Indiana State Police after he refused to work at a casino, an enterprise that contravenes his religious beliefs. He sued under Title VII of the Civil Rights Act of 1964, contending that Indiana discriminated against him on account of religion. Endres relies on a definition in §701(j) of that Act, 42 U.S.C. §2000e(j), which provides that religion "includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business."

Indiana concedes that the State Police must not discriminate against any religious faith but relies on *Employment Division v. Smith*, 494 U.S. 872 (1990), for the proposition that it need not accommodate religiously inspired practices adversely affected by rules that are neutral with respect to religion. To the extent an accommodation requirement extends beyond the first amendment, Indiana insists, it rests on the Constitution's commerce clause and not on §5 of the fourteenth amendment. That does not undermine §701(j)'s validity as applied to state employees, see *Garcia v. San*

*Antonio Metropolitan Transit Authority*, 469 U.S. 528 (1985), but does affect where litigation must occur—for, when Congress acts only under the commerce power, the eleventh amendment permits states to insist that suit be in state court. Compare *Fitzpatrick v. Bitzer*, 427 U.S. 445 (1976), with *Seminole Tribe v. Florida*, 517 U.S. 44 (1996). In *Boerne v. Flores*, 521 U.S. 507 (1997), the Court concluded that the Religious Freedom Restoration Act, 42 U.S.C. §2000bb to §2000bb-4, exceeds the power granted by §5 and therefore may not support a private action in federal court against a state. Indiana submits that §701(j), which like the RFRA requires accommodation rather than neutrality, also is not §5 legislation. After the United States intervened to defend the constitutionality of Title VII, the district judge rejected Indiana's argument and held that litigation may proceed in federal court. *Endres v. Indiana State Police*, No. 3:01-CV-0518 (N.D. Ind. Dec. 28, 2001) (unpublished order). The state took an interlocutory appeal. See *Lapides v. University of Georgia*, 535 U.S. 613 (2002); *Puerto Rico Aqueduct & Sewer Authority v. Metcalf & Eddy, Inc.*, 506 U.S. 139 (1993).

Endres joined the State Police in 1991. After Indiana began to license casinos, the State Police designated some of its officers as Gaming Commission agents. In March 2000 Endres was assigned to a full-time position as an agent at the Blue Chip Casino in Michigan City, Indiana. Gaming Commission agents certify gambling revenue, investigate complaints from the public about the gaming system, and conduct licensing investigations for the casinos and their employees. Endres worships at the Community Baptist Church in South Bend; he and other congregants believe they must neither gamble nor help others to do so, because games of chance are sinful. Endres told the State Police that, although he was willing to enforce general vice laws at casinos, providing the specialized services required of

Gaming Commission agents would violate his religious beliefs because it would facilitate gambling. He asked for a different assignment; the State Police declined. Endres then refused to report for duty and was fired for insubordination. An assignment to this position because of (rather than in spite of, or with indifference to) his religious beliefs would violate the Constitution, see *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256 (1979), but Endres does not contend that his religion played any role in the selection. According to the complaint, he was selected by lot. Nor did the State Police hold his views against him after he refused the assignment; it responded to his deeds, not his faith, and Endres does not contend that he was treated more severely than he would have been had he refused the same position for secular reasons. As a result, neither the posting nor the decision not to accommodate Endres's desire for different duties violated the free exercise clause of the first amendment, as *Smith* understands that clause.

Before taking up the question whether §701(j) is an exercise of §5 powers, we first inquire whether §701(j) obliges states to afford the sort of accommodation that Endres requested. A negative answer will enable the court to avoid a constitutional issue, which makes it prudent to follow the model that the Supreme Court established in *Saucier v. Katz*, 533 U.S. 194, 201 (2001), for qualified-immunity appeals by state actors: determine whether the complaint states a claim before inquiring whether the defendants have immunity. Because the eleventh amendment does not curtail subject-matter jurisdiction (if it did, states could not consent to litigate in federal court, as *Lapides* holds that they may), a court is free to tackle the issues in this order, when it makes sense to do so, without violating the rule that jurisdictional issues must be resolved ahead of the merits. See *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 778-80 (2000).

Endres contends that §701(j) gives law-enforcement personnel a right to choose which laws they will enforce, and whom they will protect from crime. Many officers have religious scruples about particular activities: to give just a few examples, Baptists oppose liquor as well as gambling, Roman Catholics oppose abortion, Jews and Muslims oppose the consumption of pork, and a few faiths (such as the one at issue in *Smith*) include hallucinogenic drugs in their worship and thus oppose legal prohibitions of those drugs. If Endres is right, all of these faiths, and more, must be accommodated by assigning believers to duties compatible with their principles. Does §701(j) require the State Police to assign Unitarians to guard the abortion clinic, Catholics to prevent thefts from liquor stores, and Baptists to investigate claims that supermarkets mis-weigh bacon and shellfish? Must prostitutes be left exposed to slavery or murder at the hands of pimps because protecting them from crime would encourage them to ply their trade and thus offend almost every religious faith?

The Supreme Court held in *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977), that §701(j) does not require an accommodation that would cause more than minimal hardship to the employer or other employees. See also *Ansonia Board of Education v. Philbrook*, 479 U.S. 60, 67-69 (1986). Juggling assignments to make each compatible with the varying religious beliefs of a heterogeneous police force would be daunting to managers and difficult for other officers who would be called on to fill in for the objectors. Whether or not a paramilitary organization could accommodate task-specific conscientious objection without undue hardship, however, the demand would not be reasonable—and §701(j) calls only for reasonable accommodations. Reasonableness and the avoidance of undue hardship are distinct. Cf. *Vande Zande v. Wisconsin Department of Administration*, 44 F.3d 538 (7th Cir. 1995) (discussing the

difference between "reasonable" accommodation and "undue hardship" under the Americans with Disabilities Act). Selective objection to some of the employer's goals raises problems on the "reasonableness" branch as well as the "undue hardship" branch. See *Reed v. Great Lakes Cos.*, 330 F.3d 931 (7th Cir. 2003). This is especially pertinent when the assignment is unpopular: the State Police had to draft Endres because there were not enough volunteers. Excusing officers from the risk of unpopular assignments would create substantial costs for fellow officers who must step in, as well as the police force as an entity.

This is the third time we have had to consider how §701(j) applies to requests by law-enforcement personnel to choose which crimes they will investigate and which potential victims they will protect. In *Ryan v. Department of Justice*, 950 F.2d 458 (7th Cir. 1991), an FBI agent claimed a right to be free of any assignment concerning nonviolent opposition to military activities—such as, for example, protesters who vandalize military installations, see *United States v. Urfer*, 287 F.3d 663 (7th Cir. 2002), or pour blood on military records, see *United States v. Berrigan*, 437 F.2d 750 (4th Cir. 1971). Agent Ryan's views stemmed from the U.S. Bishops' Pastoral Letter on War and Peace; his sincerity was not in doubt. Nonetheless, we held, §701(j) did not protect him from discharge for insubordination:

> It is difficult for any organization to accommodate employees who are choosy about assignments; for a paramilitary organization the tension is even greater. Conscientious objectors in the military seek discharge, which accommodates their beliefs and the military's need for obedience. Ryan received discharge but does not want it. He wants to be an agent and to choose his assignments too. With good will all around, and flexibility on the part of Ryan's fellow agents, it just might be possible to make a go

of it. Title VII does not, however, compel the FBI to attempt this. Legal institutions lack the sense of nuance that will tell an experienced agent how far the rules may be bent without injury to the FBI's mission. Compelled, as it is by Title VII, to have one rule for all of the diverse religious beliefs and practices in the United States, the FBI may choose to be stingy with exceptions lest the demand for them overwhelm it.

950 F.2d at 462. Our second case was *Rodriguez v. Chicago*, 156 F.3d 771 (7th Cir. 1998). Rodriguez, like Ryan a Roman Catholic, refused to protect abortion clinics and their clients. Again the sincerity of his views was unquestioned; again the officer lost, this time because an accommodation had been offered in the form of an opportunity to transfer to a precinct without abortion clinics (which avoided the need to determine whether the offer had been required). Chief Judge Posner filed a concurring opinion addressing the question that the majority had ducked and concluding, in part on the authority of *Ryan*, that agencies such as police and fire departments designed to protect the public from danger may insist that *all* of their personnel protect *all* members of the public—that they leave their religious (and other) views behind so that they may serve all without favor on religious grounds. That is, after all, an obligation both state law and the Constitution fasten on the police. If police and fire departments must enforce the law and protect potential victims free of religious favoritism, then they may insist that all members of their forces (volunteers rather than conscripts) do their parts in fulfilling this duty. "[P]ublic protectors such as police and firefighters must be neutral in providing their services." *Shelton v. University of Medicine & Dentistry*, 223 F.3d 220, 228 (3d Cir. 2000).

Perhaps one could say that *Ryan* does not *compel* this conclusion; agent Ryan had been offered one form of ac-

commodation (a swap of assignments with a fellow agent), and officer Endres lacked any similar way out. Yet what principally led to Ryan's discharge (as opposed to lesser discipline) was his failure to follow a direct order, coupled with a claim of entitlement in the future to choose which crimes would be investigated and which potential victims protected. Endres has made a claim of entitlement similar to Ryan's—broader to the extent that Endres claims a right to reject an entire job classification, while Ryan claimed only the right to reject particular investigations— and Endres's employer has not offered a similar accommodation. Certainly nothing in *Ryan* or *Rodriguez* implies that there *must* be such an offer: those cases deemed proffered accommodations adequate and did not reach the question whether any had been necessary. Here, where no accommodation was attempted, we must decide whether the statute requires one, and we hold that it does not. Endres has made a demand that it would be unreasonable to require any police or fire department to tolerate.

Law-enforcement agencies need the cooperation of all members. Even if it proves possible to swap assignments on one occasion, another may arise when personnel are not available to cover for selective objectors, or when (as in *Hardison*) seniority systems or limits on overtime curtail the options for shuffling personnel. Beyond all of this is the need to hold police officers to their promise to enforce the law without favoritism—as judges take an oath to enforce *all* laws, without regard to their (or the litigants') social, political, or religious beliefs. Firefighters must extinguish all fires, even those in places of worship that the firefighter regards as heretical. Just so with police.

> The public knows that its protectors have a private agenda; everyone does. But it would like to think that they leave that agenda at home when they are on duty—that Jewish policemen protect neo-Nazi

demonstrators, that Roman Catholic policemen protect abortion clinics, that Black Muslim police-men protect Christians and Jews, that fundamen-talist Christian policemen protect noisy atheists and white-hating Rastafarians, that Mormon policemen protect Scientologists, and that Greek-Orthodox policemen of Serbian ethnicity protect Roman Catholic Croats. We judges certainly want to think that U.S. Marshals protect us from assaults and threats without regard to whether, for example, we vote for or against the pro-life position in abortion cases.

*Rodriguez*, 156 F.3d at 779 (Posner, C.J., concurring). And, we add, that Baptist policemen protect gamblers from theft and fraud (and casino operators from sticky-fingered gamblers and employees with falsified credentials). Cf. *Gillette v. United States*, 401 U.S. 437 (1971) (selective conscientious objection does not excuse military service).

Endres advanced a claim under 42 U.S.C. §1983 as well as one under Title VII. The Indiana State Police, as a unit of state government, is not a "person" as §1983 uses that term and therefore is not amenable to a suit for damages under that statute. See *Will v. Michigan Department of State Police*, 491 U.S. 58 (1989). There is no point in re-manding to allow Endres to fix this problem by adding other defendants. His claim under the free exercise clause is incompatible with *Smith*, and only §701(j) offered any prospect of success. The district court's disposition of Endres's suit therefore is reversed outright; his complaint fails to state a claim on which relief may be granted.

The decision of the district court is reversed, and the case is remanded with instructions to enter judgment for the State Police on the merits.

RIPPLE, *Circuit Judge*, with whom ROVNER and WILLIAMS, *Circuit Judges*, join, dissenting from the denial of rehearing en banc. Today, the court declines to rehear en banc a case that departs significantly from this court's fundamental approach to statutory interpretation. In doing so, it sets our court apart from the other circuits with respect to a fundamental aspect of Title VII law and deprives those who serve us in important public safety positions from a protection that they enjoy in every other circuit in the United States. For the reasons set forth in the following paragraphs, I respectfully dissent from the denial of rehearing en banc.

Benjamin Endres was an officer for the Indiana State Police. After Indiana began to license casinos, the State Police designated some of its officers as Gaming Commission Agents. In March 2000, Mr. Endres was designated as a Gaming Commission Agent and was assigned *full time* to the Blue Chip Casino in Michigan City, Indiana. Mr. Endres is a Baptist; he believes that gambling is a sin and that he must neither gamble nor help others to do so. As admitted by the court, although Mr. Endres did not object to enforcing general vice laws on casino property, Mr. Endres informed his supervisors that providing full-time services at the casino would violate his religious beliefs; he, therefore, requested a different assignment. The State Police refused. When Mr. Endres failed to report for duty, he was fired for insubordination. Mr. Endres subsequently filed suit under Title VII and claimed that the State of Indiana failed to accommodate reasonably his religious beliefs.

In addressing his claim, the panel first noted, correctly, that "§701(j) does not require an accommodation that would cause more than minimal hardship to the employer or other employees." *Endres v. Indiana State Police*, No. 02-1247, slip op. at 5 (7th Cir. Nov. 19, 2003) (citing *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977)).

However, it then continued:

> Juggling assignments to make each compatible with the varying religious beliefs of a heterogeneous police force would be daunting to managers and difficult for other officers who would be called on to fill in for the objectors. Whether or not a paramilitary organization could accommodate task-specific conscientious objection without undue hardship, however, the demand would not be reasonable—and §701(j) calls only for reasonable accommodations.

*Id.* Comparing Mr. Endres' request to that of the plaintiff in *Ryan v. Department of Justice*, 950 F.2d 458 (7th Cir. 1991), the panel held that such a request is per se unreasonable in the context of a police or fire department. *See id.* at 5-6.

The panel's disposition of Mr. Endres' accommodation claim contains several crucial errors. First, the panel recharacterizes the scope of the accommodation that Mr. Endres sought. Mr. Endres simply asked that he not be assigned on a permanent, full-time basis to a gambling establishment; he did not seek to avoid all law enforcement activity with respect to a casino. Consequently, his request did not either require the ongoing "[j]uggling [of] assignments" or involve an officer choosing which law he would enforce—elements of Mr. Endres' claim that the panel found so troubling.

The panel's resolution also fails to adhere to the established law of this and every other circuit. Employing a less polemical characterization, this court has twice addressed accommodations that must be offered to law enforcement personnel who seek to avoid specific assignments on religious grounds. Most recently in *Rodriguez v. City of Chicago*, 156 F.3d 771 (7th Cir. 1998), we addressed the request of a Catholic police officer to be exempted from assignments at abortion clinics. In evaluating the City's

alleged failure to accommodate, we reiterated the standard to be applied:

> Under Title VII, therefore, an employer must reasonably accommodate an employee's religious observance or practice unless it can demonstrate that such accommodation would result in an undue hardship to the employer's business. Accordingly, we turn first to the issue of whether the City has satisfied its duty of reasonable accommodation; only if we answer that question in the negative need we proceed to the "undue hardship" prong of the Title VII analysis.

*Id.* at 775. Applying this standard, we determined that the City had satisfied its duty of reasonable accommodation because, under the existing collective bargaining agreement, the officer in question could have secured a transfer to a district without an abortion clinic without any reduction in his level of pay or benefits. *See id.* In an earlier case, *Ryan v. United States Department of Justice*, 950 F.2d 458 (7th Cir. 1991), we reached a similar conclusion. Ryan was a Federal Bureau of Investigation agent who, on religious grounds, "repeatedly refused to carry out a lawful order to investigate an unsolved federal offense; he declined to swap assignments; he would not promise to carry out similar orders in the future . . . ." 950 F.2d at 461. Although seeking to be removed from the investigation of any peaceful, anti-war protestors, "Ryan proposed no course other than discontinuing investigations of the sort to which he is opposed, which would be capitulation rather than accommodation." *Id.* Under these circumstances, we determined the FBI had not failed to accommodate Ryan's religious beliefs.

Notably absent from our resolution of either Rodriguez's or Ryan's claim, however, was a holding that the agencies were exempt from the statutory requirement of reasonable

accommodation because of their law enforcement mission. Indeed, the panel in *Endres* acknowledges that "*Ryan* does not *compel*" its conclusion. *Endres*, slip op. at 8. Quite the opposite, *Ryan* acknowledged the unreasonableness of the request to cease investigations when the perfectly reasonable solution of an assignment swap had been proposed and rejected.

Not only does the panel's decision here abandon the analytical framework of *Rodriguez* and *Ryan*, it also ignores the clear language of the statute. It simply blue pencils the reasonable accommodation requirement from the statute as it applies to police and fire personnel. It relies on no language of the statute, no interpretive regulation, no legislative history. It simply constructs a categorical statutory amendment where none exists. Congress took a different view. Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a)(1). Furthermore, Title VII's definition of religion includes "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate . . . an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business." *Id.* § 2000e(j). Neither the definition of religion, nor the definition of employer in § 2000e(b), suggests that law enforcement agencies, fire departments, or any other "paramilitary" employers are exempt from the reasonable accommodation provisions. Consequently, a law enforcement exception to the reasonable accommodation requirement finds no support in the plain language of Title VII.

I have no doubt that public safety agencies have a great deal of latitude in accommodating the religiously based

requests of their employees for exemptions from particular duties. Both our previous case law and the case law of the other circuits make that proposition clear.[1] But Congress simply did not determine that these agencies ought to be given a blanket exemption from the mandate of the statute, and, I respectfully suggest, Congress' ability to determine the wisdom of such an exemption is far superior to ours. On a nationwide scale, public safety organizations come in many shapes and sizes. Some are highly professional; some are not. Some are relatively immune from prejudices, be they racial or religious or otherwise; some are not. Congress apparently saw no reason to exempt categorically such organizations from the plain mandate of the statute and preferred that the boundaries of the reasonable accommodation requirement be established in case-by-case adjudication.

The court's decision to let this panel decision stand will raise, regretfully, many questions in the minds of many people. Public safety and emergency personnel, whose contributions to our daily lives are so much more appreciated these days, have every right to ask why this court has singled them out as not deserving of a statutory protection

---

[1] *See, e.g.*, *Shelton v. Univ. of Med. & Dentistry of New Jersey*, 223 F.3d 220, 228 (3d Cir. 2000) (finding public hospital had reasonably accommodated Pentecostal nurse opposed to assisting with emergency abortions by offering her different assignment); *Beadle v. City of Tampa*, 42 F.3d 633, 637 (11th Cir. 1995) (applying reasonable accommodation analysis and holding that excusing Seventh Day Adventist officer from all Friday evening and Saturday shifts would work an undue hardship); *Miller v. Drennon*, 1992 WL 137578 (4th Cir. June 19, 1992) (applying reasonable accommodation analysis and finding that county had offered reasonable accommodations to emergency medical worker who was opposed to sharing one-room apartment with a member of the opposite sex when on twenty-four hour shifts).

guaranteed to every other person in the United States. Members of minority religions, whose doctrines are not well-understood or appreciated in our culture, may well wonder whether municipalities within this circuit are the best place in which to make a public contribution. Hopefully, these doubts will be lessened by enlightened municipal management who certainly could ensure that those who serve us are protected despite this court's decision to depart from the anti-discrimination standards enforced in the rest of the United States.

Members of the practicing judiciary and the practicing bar in this circuit also will be puzzled by this court's departure from its usual methodology in interpreting statutes. Time and time again, we profess that, in interpreting a statute, we begin with the plain wording of the statute. Unless there is an ambiguity, we apply the explicit command of Congress. No one suggests that Congress has left any doubt as to what it expects in this situation. Unfortunately, however, our current decisional behavior does not follow the course of our rhetoric. In future cases, judges, attorneys, and litigants will have to accept the reality that they must observe not what we say, but what we do.

A true Copy:

      Teste:

                    _____
                    *Clerk of the United States Court of Appeals for the Seventh Circuit*