2025 IL App (1st) 250148-U

No. 1-25-0148

Order filed December 4, 2025

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| JOHN SCHOFF and JANE STOLLER-SCHOFF, | ) | Petition for Review of |
| | ) | an Order of the Illinois Human |
| Petitioners-Appellants, | ) | Rights Commission |
| | ) | |
| v. | ) | |
| | ) | |
| ILLINOIS HUMAN RIGHTS COMMISSION; | ) | |
| JACQUELINE Y. COLLINS, as Commissioner of the | ) | |
| Illinois Human Rights Commission; JANICE M. GLENN, | ) | |
| as Commissioner of the Illinois Human Rights | ) | |
| Commission; HOWARD A. ROSENBLUM, as | ) | |
| Commissioner of the Illinois Human Rights Commission; | ) | |
| ILLINOIS DEPARTMENT OF HUMAN RIGHTS; and | ) | |
| VILLAGE OF SOUTH BARRINGTON, an Illinois | ) | |
| Municipal Corporation, | ) | |
| | ) | |
| Respondents-Appellees. | ) | Charge No. 2021CH1683 |

_____

PRESIDING JUSTICE NAVARRO delivered the judgment of the court.
Justices Lyle and Quish concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm the decision of the Illinois Human Rights Commission to sustain the Illinois Department of Human Rights' dismissal of the petitioners' charge of

housing discrimination against the Village of South Barrington for lack of substantial evidence.

¶ 2    After petitioners, John Schoff and Jane Stoller-Schoff (collectively, the Schoffs), filed a charge of housing discrimination against the Village of South Barrington (Village), the Illinois Department of Human Rights (Department) investigated the charge and dismissed the charge for lack of substantial evidence. The Schoffs filed a request for review with the Illinois Human Rights Commission (Commission), which sustained the Department's dismissal. Thereafter, the Schoffs filed a petition for direct administrative review in this court and now contend for a multitude of reasons that the Commission erred in sustaining the Department's dismissal. For the reasons that follow, we affirm the Commission's decision.

¶ 3                                I. BACKGROUND

¶ 4    The Village has approximately 5,000 residents and 1,500 households. Most properties in the Village are not connected to public sewers, but rather rely on septic systems to dispose of household waste. A septic system consists of two components: one or more septic tanks and a drain field. The septic tanks collect the solid and liquid waste. While the solid waste sinks to the bottom of the septic tank and remains there, the liquid waste moves through the tank and into the drain field, where the liquid absorbs into the soil. The solid waste, meanwhile, must be periodically pumped out of the septic tank. If a septic system is too small, raw sewage could spill out of the septic tank and potentially flood the drain field and pollute nearby waterways.

¶ 5    The Village is governed by a municipal code, which has a chapter dedicated to the governance of septic systems (the septic code). South Barrington Municipal Code § 4-7-1 (adopted Feb. 12, 2015). In the septic code, the Village expressly adopted the Illinois Private Sewage Disposal Code (77 Ill. Adm. Code 905.10 *et seq.* (2013)), but to the extent the Village had more

restrictive requirements, the Village's requirements govern. South Barrington Municipal Code § 4-7-1 (adopted Feb. 12, 2015). According to Village's septic code, the minimum liquid capacity of a septic tank system for a house with five bedrooms was 2,500 gallons. *Id.* § 4-7-2. For a house with seven bedrooms, the minimum liquid capacity was 3,500 gallons. *Id.* The Illinois Private Sewage Disposal Code has reduced capacity requirements. See 77 Ill. Adm. Code 905.Appendix A, Illustration F (1996).

¶ 6     In 1985, the property at issue, a single-family residence, was built with 5 bedrooms and two 1,500-gallon septic tanks in the Village, resulting in a 3,000-gallon septic capacity. At some point prior to 2014, the property owner added two unpermitted bedrooms to the residence, bringing the total number of bedrooms to seven. In 2014, the Schoffs, who are Episcopalian Christians, bought the property. Due to their faith, the Schoffs believed they were called to provide short-term housing to people in need, specifically asylum seekers, missionaries and refugees. The Schoffs' beliefs led them to house, at various times, predominantly Black individuals from Africa, but also occasionally Chinese, Japanese, Colombian and white individuals.

¶ 7     In June 2019, a woman, who had been pulled over by the police for reckless driving, complained that she had been kicked out of the Schoffs' residence after residing there for 18 months. The complaint reached Mike Moreland, the Village's building and zoning officer, who, upon further investigation, learned that the Schoffs housed various non-related individuals in their residence, including renting rooms. Because the Village had a municipal ordinance prohibiting short-term rentals, it notified the Schoffs that they were violating the municipal code and began an administrative enforcement action against them. In response, the Schoffs requested an

accommodation to continue providing short-term housing pursuant to the Illinois Religious Freedom Restoration Act (Religious Freedom Act) (775 ILCS 35/1 *et seq.* (West 2018)).

¶ 8    In October 2019, the Schoffs and the Village agreed to settle the administrative enforcement action. The Village agreed to dismiss its enforcement action with prejudice, allow the Schoffs to rent rooms in their residence to tenants with leases of at least one year, and allow the Schoffs a religious accommodation to house short-term occupants, including "missionaries, refugees, and asylum seekers" as long as they provided the Village notice. In exchange, the Schoffs were required to pay the Village $2,500 and allow the Village to complete an inspection of their property, including their septic system, to ensure that the property could safely house additional residents. If any code violations arose, the Schoffs were required to correct them. The agreement explicitly provided that the Village did not waive its police power or its right to enforce any other municipal ordinance violations.

¶ 9    Following the settlement agreement, the Village performed an inspection of the Schoffs' property. During the inspection, the Village learned someone had added two unpermitted bedrooms, resulting in the Schoffs' septic system being too small for the number of bedrooms in the residence. Moreland informed the Schoffs that they either had to remove two bedrooms, which also would require them to remove two bathrooms, or increase the size of their septic system. The Schoffs were reluctant to do either, as increasing the size of their septic system was costly and removing bedrooms would limit their abilities to house people.

¶ 10    Instead, in May 2020, the Schoffs inquired with the Village about the possibility of a variance, but the Village told them that a variance was not possible and denied them a hearing on their request. While the Village ultimately relented and provided the Schoffs a variance hearing,

the Village did not grant them a variance. Later that month, after months of inaction by the Schoffs on their septic code violations, the Village issued them four citations for violating the septic code. The Village proceeded to an administrative hearing on the citations, where a hearing officer found the Schoffs liable on three of the citations.

¶ 11    In April 2021, believing that the Village had discriminated against them, the Schoffs filed a charge of housing discrimination against the Village with the United States Department of Housing and Urban Development, which was cross-filed with the Department. The Schoffs alleged that the Village's prosecution of the septic code violations against them amounted to harassment, interfered with their religious beliefs, and interfered with their association with Black and African asylum seekers and missionaries. The Schoffs asserted that the Village's interpretation of its septic code was unreasonable and the Village engaged in selective enforcement of it. Based on their allegations, the Schoffs contended that the Village had violated various federal laws and sections 3-102(B), 3-105(B)(1) and 3-105.1 of the Illinois Human Rights Act (Act) (775 ILCS 5/3-102(B), 3-105(B)(1), 3-105.1 (West 2020)).

¶ 12    The Schoffs' charge of discrimination consisted of nine counts. Counts A, D and G alleged that the Village imposed discriminatory terms and conditions against the Schoffs (Count A), harassed the Schoffs (Count D), and imposed an unlawful restrictive covenant against the Schoffs (Count G) due to their association with asylum seekers, missionaries and refugees whose race was Black. Counts B, E and H alleged that the Village imposed discriminatory terms and conditions against the Schoffs (Count B), harassed the Schoffs (Count E), and imposed an unlawful restrictive covenant against the Schoffs (Count H) due to their association with asylum seekers, missionaries and refugees whose national origin was Africa. Lastly, Counts C, F and I alleged that the Village

imposed discriminatory terms and conditions against the Schoffs (Count C), harassed the Schoffs (Count F), and imposed an unlawful restrictive covenant against the Schoffs (Count I) because of their religion as Episcopalians. The Village denied the charge of discrimination and asserted that none of its actions against the Schoffs were motivated or based on race, national origin or religion.

¶ 13    Shortly after filing their charge of discrimination against the Village, the Schoffs filed a five-count complaint against the Village, Moreland and an administrative hearing officer in the circuit court of Cook County. The Schoffs claimed that the Village violated federal law, the United States Constitution and the Religious Freedom Act (775 ILCS 35/1 *et seq.* (West 2020)) by enforcing the septic code against them where the septic code interfered with their free exercise of religion. In their complaint, the Schoffs also sought administrative review of the administrative hearing in which the hearing officer found them liable for three of the citations and a petition for writ of *certiorari* to have the Village's denial of a variance judicially reviewed. That case remains pending in the circuit court.

¶ 14    After initiating their charge of discrimination against the Village, the Department investigated the Schoffs' allegations. In doing so, the Department interviewed John Schoff multiple times and Moreland. During the Department's interviews with John Schoff, he claimed that homeowners who provide shelter to individuals not from Africa were "treated more favorably" by the Village and were not issued septic code violations. During the Department's interview with Moreland, he explained the dangers of inadequate septic systems. Moreland asserted that, while an insufficiently-sized system could work in the short term, the system would eventually "fail." During Moreland's interview, he stated that he was a Christian, he did not know what specific religion the Schoffs practiced, and he "did not care about race or religion." Moreland only knew

that the Schoffs "were Christians, and they feel they should share their home with people in need." Moreland believed that the Village had issued citations for septic code violations to other residents, but "he preferred to deal with residents face to face" rather than issue citations.

¶ 15     The Department also reviewed various documents, including a letter from the Village engineer to two Asian residents, whose religious affiliation was unknown. The engineer recounted an in-person conversation with the couple about their drainage pipes causing standing water and erosion in a right-of-way. The engineer noted that such issues violated the municipal code and requested the couple resolve the issue by a certain date. Additionally, the Department reviewed another letter from the Village engineer to a resident, whose religious affiliation was unknown, where the engineer requested that the resident redirect a sump pump discharge pipe that was causing issues for a neighbor.

¶ 16     Following the investigation, a Department investigator issued a report recommending that all nine of the Schoffs' counts be dismissed for lack of substantial evidence. In October 2023, the Department accepted the investigator's recommendations and dismissed the Schoffs' charge of discrimination for lack of substantial evidence.

¶ 17     Thereafter, the Schoffs filed a request for review with the Commission. The Schoffs contended that the Department's analysis was flawed because it relied entirely on whether they were discriminated against based on their religious identity, not whether they were discriminated against based on their religious observance and practice. Under the proper analysis, the Schoffs asserted that the Village's denial of a variance was evidence that they were discriminated against based on their religious observance and practice. The Schoffs argued that, even absent evidence of discrimination, the septic code could be viewed as having a disparate impact on their religious

practice. Lastly, the Schoffs highlighted a mechanical evaluation performed by Kyle Osier, a licensed professional engineer, which they attached to their request for review. Osier concluded that, based on the specifications of the Schoffs' septic system, their system was "acceptable to accommodate numerous persons living" there. The Department and the Village responded to the Schoff's request for review, arguing that the Commission should sustain the Department's dismissal, as the Schoffs failed to make a *prima facie* showing of discriminatory terms or conditions, harassment or the Village subjecting them to an unlawful restrictive covenant.

¶ 18    In December 2024, the Commission entered a final order by a vote of three commissioners to zero to sustain the Department's dismissal for lack of substantial evidence. For Counts A, B and C, the Commission determined that the Schoffs failed to make a *prima facie* showing of discriminatory terms or conditions because there was no evidence the Village treated a similarly situated group outside of the Schoffs' protected classes more favorably under similar circumstances. For Counts D, E and F, the Commission determined that the Schoffs failed to make a *prima facie* showing of harassment because there was no evidence that the Village's actions were motivated by an intent to discriminate. For Counts G, H and I, the Commission determined that the Schoffs failed to make a *prima facie* showing of an unlawful restrictive covenant because there was no evidence that the Village's septic code restricted or limited the Schoffs' use or enjoyment of their property on the basis of race, national origin or religion. Lastly, the Commission observed that the Schoffs raised their disparate-impact theory of discrimination for the first time in their request for review. But the Commission asserted that it only had jurisdiction to review theories raised in the charge of discrimination, and therefore, it could not address the disparate-impact theory of discrimination.

¶ 19    The Schoffs timely filed a petition for direct administrative review in this court. See 775 ILCS 5/8-111(B)(1) (West 2020); Ill. S. Ct. R. 335 (eff. July 1, 2017). The Commission and Department have filed a joint appellees' brief while the Village has filed its own appellee's brief.

¶ 20                                    II. ANALYSIS

¶ 21                        A. Evidence Not Before the Commission

¶ 22    At the outset, we note that, in the Schoffs' opening brief, they refer to facts that were allegedly included in documents before the Department, but not included in the administrative record filed in this court. The Schoffs included these documents in the appendix to their brief. In conjunction with the inclusion of these documents in their appendix, following the filing of their opening brief, the Schoffs filed a motion to supplement the record on appeal with these documents. This, court, however, denied their motion.

¶ 23    Under Illinois Supreme Court Rule 335(d) (eff. July 1, 2017), "[t]he entire record before the administrative agency shall be the record on review" in direct administrative review cases unless the parties agree to omit portions of the record. In this case, as the Commission entered the final order, it is the relevant administrative agency for Rule 335(d). See *Schwartz v. Illinois Human Rights Comm'n*, 2024 IL App (4th) 231248, ¶ 60. A case can reach the Commission if, following the Department's dismissal of a charge of discrimination, the complainant files a timely request for review. 775 ILCS 5/7B-102(D)(2)(a), 8-103 (West 2020). When filing a request for review, the complainant may provide the Commission any "supplemental evidence" it desires the Commission to consider. *Id.* § 8-103(B); 56 Ill. Adm. Code § 5300.410 (2022). Once the request for review is filed, the Commission must notify the Department. 56 Ill. Adm. Code § 5300.420 (1981). If the Department opposes the request for review, it must file a response that includes: (1)

a copy of the charge of discrimination; (2) its investigative report; (3) the results of any additional investigation; and (4) a position statement. 56 Ill. Admin. Code § 5300.430(a) (2022). In turn, the documentation the Department provides to the Commission and any supplemental evidence submitted by the complainant becomes the record before the Commission for purposes of Rule 335(d). Once the Rule 335(d) record is established, that is the only evidence the Commission considers (*Young v. Illinois Human Rights Comm'n*, 2012 IL App (1st) 112204, ¶ 50) and the only evidence we may consider on direct administrative review. 735 ILCS 5/3-110 (West 2020); see Ill. S. Ct. R. 335(i)(2) (eff. July 1, 2017) (applying section 3-110 of the Code of Civil Procedure to direct administrative review cases).

¶ 24    When the Schoffs filed their request for review, the only supplemental evidence they submitted was the mechanical evaluation performed by Osier. In opposing the Schoffs' request for review, the Department met its documentation obligation by providing a copy of the charge of discrimination, its final investigative report and its determination that the charge lacked substantial evidence, among other documents. That is to say, the mechanical evaluation, the only supplemental evidence submitted by the Schoffs, and the documents the Department provided to the Commission became the Rule 335(d) record and the only evidence we may consider in this direct administrative review. See 735 ILCS 5/3-110 (West 2020). Consistent with our denial of the Schoffs' motion for leave to supplement the record on appeal, we must ignore any alleged facts in the Schoffs' statement of facts based on documents not before the Commission and ignore the corresponding documents contained in the appendix to their opening brief. Because we will simply disregard any statement of fact based on documents not included in the Rule 335(d) record, we need not strike those portions of the Schoffs' brief, as suggested by the Village.

¶ 25 Additionally, in the Schoffs' opening brief, they posited that, if this court denied their motion to supplement the record, we should summarily reverse the decision of the Commission or remand the matter to the Commission to consider this additional evidence. Because the onus was on the Schoffs to provide any supplemental evidence it wished the Commission to consider (see 775 ILCS 5/8-103(B) (West 2020); 56 Ill. Adm. Code § 5300.410 (2022)) and they failed to provide this additional evidence to the Commission, there is no basis to summarily reverse the decision of the Commission or remand the matter to the Commission.

¶ 26                    B. The Commission's Decision

¶ 27 With that preliminary issue resolved, we turn to the decision of the Commission to sustain the Department's dismissal for lack of substantial evidence. The Schoffs contend that the Commission erred in sustaining the Department's dismissal, primarily because the Commission erred in how it analyzed their charge of housing discrimination based on their religion. In fact, the Schoffs do not raise any dispute with the Commission's findings on their alleged civil rights violations based upon race or national origin. As such, any argument that the Commission erred in dismissing Counts A, D and G, which alleged civil rights violations based on race, and Counts B, E and H, which alleged civil rights violations based on national origin, are forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited ***."). Accordingly, we confine our analysis to whether the Commission properly sustained the Department's dismissal on Counts C, F and I—the alleged civil rights violations based on religion.

¶ 28 Under the Act, it is a civil rights violation for a local government to "[a]lter the terms, conditions or privileges of a real estate transaction or in the furnishing of facilities or services in connection therewith" on the basis of religion. 775 ILCS 5/1-103(L), (Q); 3-102(B) (West 2020).

It is also "a civil rights violation to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed" his or her religion. *Id.* § 3-105.1. In addition, "[e]very provision in an oral agreement or a written instrument relating to real property which purports to forbid or restrict the conveyance, encumbrance, occupancy, or lease thereof on the basis of *** religion *** is void." *Id.* § 3-105(A). And "[e]very condition, restriction or prohibition, *** which directly or indirectly limits the use or occupancy of real property on the basis of *** religion *** is void." *Id.* § 3-105(B)(1). "Religion," according to the Act, "includes all aspects of religious observance and practice, as well as belief ***." *Id.* § 1-103(N).

¶ 29    Under the Act, when a complainant timely files a charge of a civil rights violation, the Department must conduct a full investigation of the charge. *Id.* § 7B-102(A), (C). Following the Department's investigation, if it determines there is not "substantial evidence" to support the charge, it shall dismiss the charge. *Id.* § 7B-102(D)(2)(a). "Substantial evidence is evidence which a reasonable mind accepts as sufficient to support a particular conclusion and which consists of more than a mere scintilla but may be somewhat less than a preponderance." *Id.* § 7A-102(D)(2). "[M]ere speculation and conjecture does not constitute substantial evidence." *Folbert v. Department of Human Rights*, 303 Ill. App. 3d 13, 25 (1999). During the investigatory phase, the critical question is whether there is "enough evidence" of a civil rights violation to proceed to the adjudicatory phase. *Id.* at 20. If the Department dismisses a charge of discrimination, the complainant may file a request for review with the Commission. 775 ILCS 5/7B-102(D)(2)(a) (West 2020). If the Commission sustains the Department's dismissal, the Commission's decision

becomes the final order. *Id.* § 8-111(B)(1). From there, the complainant may file a petition for direct administrative review to this court. *Id.*

¶ 30 On direct administrative review, we review the decision of the Commission, not the Department (*Spencer v. Illinois Human Rights Comm'n*, 2021 IL App (1st) 170026, ¶ 31), and we are "empowered to review any and all questions of law or fact presented by the record." *Anderson v. Illinois Human Rights Comm'n*, 314 Ill. App. 3d 35, 41 (2000). But "the Commission's findings of fact shall be sustained unless the court determines that such findings are contrary to the manifest weight of the evidence." 775 ILCS 5/8-111(B)(2) (West 2020). We do not provide such deference to conclusions of law or issues of statutory construction, questions over which we exercise independent review. *Raintree Health Care Center v. Illinois Human Rights Comm'n*, 173 Ill. 2d 469, 479 (1996). We, however, review the Commission's ultimate decision to sustain the Department's dismissal for lack of substantial evidence for an abuse of discretion. *Spencer*, 2021 IL App (1st) 170026, ¶ 32; *Young*, 2012 IL App (1st) 112204, ¶ 32. Under this standard, we will not reverse the Commission's decision unless no reasonable person could agree, or the Commission's decision "contravenes legislative intent, fails to consider a critical aspect of the matter, or offer[s] an explanation so implausible that it cannot be regarded as the result of an exercise of the agency's expertise." *Young*, 2012 IL App (1st) 112204, ¶ 33.

¶ 31 In arguing that the Commission improperly sustained the Department's dismissal, some of the Schoffs' key arguments concern the definition of religion under the Act. First, they assert that religious discrimination can be based not only on religious identity, but also on religious exercise and practice. As noted, the Act defines religion broadly to "include[] all aspects of religious observance and practice, as well as belief ***." 775 ILCS 5/1-103(N) (West 2020). That is to say,

the Schoffs are correct that religious discrimination under Illinois law encompasses more than just discrimination based on a religious identity, but extends to discrimination based on religious observance and practice.

¶ 32    Second, the Schoffs posit that the Commission only analyzed whether the Village discriminated against them based on their religious identity. According to the Schoffs, the Commission completely failed to consider whether the Village discriminated against them based on their religious observance and practice. Relatedly, the Schoffs argue that the Commission failed to consider that the Act has expanded protections in religious practice discrimination cases as compared to the federal Fair Housing Act (42 U.S.C. § 3601 *et seq.* (2018)). In turn, the Schoffs contend that the Commission overlooked a critical aspect of the case, mandating reversal. See *Young*, 2021 IL App (1st) 170026, ¶ 33 (the Commission abuses its discretion if it "fails to consider a critical aspect of the matter"). Both of these latter arguments are based on the broad definition of "religion" in the Act. But there is nothing in the record indicating that, when sustaining the Department's dismissal for lack of substantial evidence, the Commission misinterpreted or misapplied the definition of religion, failed to consider that religion encompassed religious observance and practice, or failed to consider that the Act has expanded protections in religious practice discrimination.

¶ 33                                              1. Count C

¶ 34    We now turn to the specific counts of the Schoffs' charge of housing discrimination involving religion, beginning with Count C. In Count C, the Schoffs alleged a civil rights violation based on the Village subjecting them to discriminatory terms or conditions based on their religion.

¶ 35    An individual may prove discrimination through direct evidence or indirect evidence. *Lalvani v. Illinois Human Rights Comm'n*, 324 Ill. App. 3d 774, 790 (2001). In the instant case, there was no direct evidence of discrimination, so the Schoffs were required to show discrimination through indirect evidence under the burden-shifting framework articulated by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). See *Zaderaka v. Illinois Human Rights Comm'n,* 131 Ill. 2d 172, 178-79 (1989) (adopting the *McDonnell Douglas* burden-shifting framework). Under this framework, the complainant bears the initial burden to establish a *prima facie* case of discrimination by a preponderance of the evidence. *Id.* If the complainant establishes a *prima facie* case, the burdens shifts to the respondent to rebut that presumption by articulating, though not proving, "a legitimate, nondiscriminatory reason for its decision." *Id.* at 179. If the respondent does so, the burden shifts back to the complainant to "prove by a preponderance of the evidence that the [respondent's] articulated reason was not its true reason, but was instead a pretext for unlawful discrimination." *Id.*

¶ 36    The elements of a *prima facie* case of discrimination will depend on the circumstances. *Acorn Corrugated Box Co. v. Illinois Human Rights Comm'n*, 181 Ill. App. 3d 122, 137 (1989). To make a *prima facie* case for Count C, the Schoffs had to show that: (1) they were a part of a protected group; (2) the Village was aware of it; (3) the Village subjected them to discriminatory terms or conditions; and (4) the Village treated a similarly situated person outside of their protected group more favorably under similar circumstances. See *Atkins v. City of Chicago Comm'n on Human Relations ex rel. Lawrence*, 281 Ill. App. 3d 1066, 1074 (1996); *Turner v. Human Rights Comm'n*, 177 Ill. App. 3d 476, 487 (1988). As the Commission found, there was no evidence that the Village treated a similarly situated person outside of the Schoffs' protected group more

favorably under similar circumstances. Neither the evidence presented by the Schoffs nor any evidence uncovered by the Department during its investigation revealed a comparator, in particular a non-Episcopalian, who was not cited for septic code violations under similar circumstances. Though not completely analogous, the Department's investigation uncovered that the Village demanded other homeowners, whose religions were unknown, fix drainage issues, at least one of which was based on a municipal code violation.

¶ 37    While the record did not show the Village instituting administrative enforcement proceedings against these homeowners, we can reasonably infer that these homeowners corrected the issues upon request obviating the need for the Village to cite them administratively like what occurred with the Schoffs. Simply put, there is no evidence that the Schoffs were treated differently than any other homeowner in the Village. See *Barricks v. Eli Lilly & Co.*, 481 F.3d 556, 560 (7th Cir. 2007) (concluding that the complainant failed to establish a *prima facie* case of age discrimination where she failed "to point to a younger employee who was similarly situated and received more favorable treatment" than her); see *Sangamon County Sheriff's Department v. Illinois Human Rights Comm'n*, 233 Ill. 2d 125, 138 (2009) (noting that appellate courts have often relied on federal cases in analyzing discrimination claims under the Act). Consequently, the Commission properly found that the Schoffs failed to make a *prima facie* showing on Count C, and therefore, it did not abuse its discretion by sustaining the Department's dismissal on Count C for lack of substantial evidence.

¶ 38                                          2. Count F

¶ 39    We next turn to the Commission's decision to sustain the Department's dismissal on Count F, which alleged a civil rights violation based on the Village coercing, intimidating, threatening,

or interfering with the Schoffs in their exercise or enjoyment of, or on account of them having exercised or enjoyed, their religion. Given the similarity between section 105.1 of the Act (775 ILCS 5/3-105.1 (West 2020)) and section 3617 of the Fair Housing Act (42 U.S.C. § 3617 (2018)), we can rely on federal case law to provide the *prima facie* test for Count F. See *Sangamon County*, 233 Ill. 2d at 138. To make a *prima facie* case for Count F, the Schoffs had to show that: (1) they belonged to a protected group; (2) they were engaging in or enjoying their housing rights; (3) the Village coerced, threatened, intimidated, or interfered with them on account of their housing rights; and (4) the Village was motivated by an intent to discriminate. *Bloch v. Frischholz*, 587 F.3d 771, 783 (7th Cir. 2009). As the Commission found, there was no evidence that the Village was motivated by an intent to discriminate when enforcing the septic code. Neither the evidence presented by the Schoffs nor any evidence uncovered by the Department during its investigation revealed any evidence of discriminatory intent. Rather, at all times, the evidence pointed to the Village enforcing its septic code due to concerns of the Schoffs' septic system failing and the resulting consequences.

¶ 40    Notably, pursuant to the settlement agreement between the Schoffs and the Village, the Village explicitly granted the Schoffs a religious accommodation to continue housing missionaries, refugees, and asylum seekers on a short-term basis, belying any notion that the Village harbored ill intent toward them based on their exercise of their religious observance or practice. Moreover, when interviewed by the Department during its investigation, Moreland, himself a Christian, was adamant that he did not consider religion when he found septic code violations on the Schoff's property. Simply put, there is no evidence that the Village was motivated by any discriminatory intent when enforcing its septic code against the Schoffs. While the

Village's enforcement of its septic code may have inconvenienced the Schoffs, that does not mean the Village was motivated by an intent to discriminate. See *East-Miller v. Lake County Highway Department*, 421 F.3d 558, 564 (7th Cir. 2005) (while a highway department may have "inconvenienced" a Black homeowner through various instances of damaging her property, she failed to present any evidence that the highway department's actions were motivated by an intent to discriminate).

¶ 41    Nevertheless, the Schoffs argue that there is substantial evidence to establish that the Village had an intent to discriminate against them based on their religious observance and practice, namely because the Village's septic code had a variance procedure, yet the Village denied them a variance. Relying on *Saints Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin*, 396 F.3d 895 (7th Cir. 2005), the Schoffs posit that, when an ordinance contains a variance procedure and the government refuses to grant a variance based upon an applicant's need to use a property for religious observance and practice, an inference of religious practice discrimination exists. *Saints Constantine* involved a land-use dispute between a church and a city related to the church building a worship center on property zoned for residential use. *Id.* at 898. In analyzing the plaintiff-church's claim, which was brought under the federal Religious Land Use and Institutionalized Persons Act of 2000 (42 U.S.C. § 2000cc(a)(1) (2000)), the United States Court of Appeals for the Seventh Circuit stated: "If a land-use decision, in this case the denial of a zoning variance, imposes a substantial burden on religious exercise *** [citation], and the decision maker cannot justify it, the inference arises that hostility to religion, or more likely to a particular sect, influenced the decision." *Saints Constantine*, 396 F.3d at 900. The problem for the Schoffs is that

*Saints Constantine* was a case brought, as noted, under the federal Religious Land Use and Institutionalized Persons Act of 2000.

¶ 42    The standards applicable in *Saints Constantine* are simply not present in the instant case. Equally as important, the critical issue when reviewing the Commission's decision to sustain the Department's dismissal for lack of substantial evidence is whether the Commission abused its discretion in finding a lack of substantial evidence. All the Schoffs can do with the fact that the Village denied them a variance is speculate that the denial had a discriminatory intent. But speculation cannot create substantial evidence. See *Folbert*, 303 Ill. App. 3d at 25. Consequently, the Commission properly found that the Schoffs failed to make a *prima facie* showing on Count F, and therefore, it did not abuse its discretion by sustaining the Department's dismissal on Count F for lack of substantial evidence.

¶ 43                                        3. Count I

¶ 44    We next turn to the Commission's decision to sustain the Department's dismissal on Count I, which alleged a civil rights violation based on the Village subjecting the Schoffs to an unlawful restrictive covenant in the form of the septic code.

¶ 45    As previously discussed, "[e]very provision in an oral agreement or a written instrument relating to real property which purports to forbid or restrict the conveyance, encumbrance, occupancy, or lease thereof on the basis of race, color, religion, or national origin is void." 775 ILCS 5/3-105(A) (West 2020). And "[e]very condition, restriction or prohibition, *** which directly or indirectly limits the use or occupancy of real property on the basis of race, color, religion, or national origin is void." *Id.* § 3-105(B)(1). No Illinois court has interpreted this section of the Act. But the quintessential example of a restrictive covenant related to real property was

discussed in the United States Supreme Court decision of *Shelley v. Kraemer*, 334 U.S. 1, 4-7 (1948), where private agreements among neighbors were created to exclude people of specific races or colors from owning or otherwise occupying real estate in the neighborhood.

¶ 46    As the Commission found, neither the evidence presented by the Schoffs nor any evidence uncovered by the Department during its investigation revealed any evidence to show that the Village's septic code forbade, restricted or encumbered the Schoffs' property on the basis of religion, or that the septic code limited the use or occupancy of their property on the basis of religion. The concerns elucidated from *Shelley*, agreements and restrictions specifically designed to preclude individuals of a particular protected class from enjoying their housing rights, are not present here. Consequently, the Commission properly found that the Schoffs failed to make a *prima facie* showing on Count I, and therefore, it did not abuse its discretion by sustaining the Department's dismissal on Count I for lack of substantial evidence.

¶ 47    Despite the lack of substantial evidence to support Counts C, F and I, the Schoffs, relying on *Robinson v. Village of Oak Park*, 2013 IL App (1st) 121220, ¶¶ 35-36, argue that the Commission's decision must be reversed because the Village had an obligation not to enforce its septic code once they asserted that the septic code interfered with their religious observance and practice unless the Village could show an undue hardship from not enforcing the septic code. As an initial matter, the Schoffs raised this argument for the first time in their reply brief, which, generally, results in a party forfeiting that argument. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1. 2020) ("Points not argued are forfeited and shall not be raised in the reply brief ***.")

¶ 48    Forfeiture notwithstanding, *Robinson*, 2013 IL App (1st) 121220, ¶ 18, involved alleged religious discrimination in the employment context. Religion, for purposes of employment

discrimination, has a unique definition compared to other types of discrimination. Under section 2-101(F) of the Act (775 ILCS 5/2-101(F) (West 2020)), " 'religion' with respect to employers includes all aspects of religious observance and practice, as well as belief, *unless an employer demonstrates that he is unable to reasonably accommodate an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business*." (Emphasis added.) Section 2-101 notes that this definition is "strictly in the context of this Article," *i.e.*, the article dealing only with discrimination in the employment context. *Id.* § 2-101. On the other hand, the definition of "religion" for other types of discrimination, including in the real estate context, is "all aspects of religious observance and practice, as well as belief except that with respect to employers, *** 'religion' has the meaning ascribed to it in paragraph (F) of Section 2-101." *Id.* § 1-103(N). Given the different definitions of religion for purposes of employment discrimination and housing discrimination, while the Schoffs repeatedly argue about the Village needing to prove "undue hardship," the Act explicitly limits the "undue hardship" standards to employment discrimination claims, not housing discrimination claims.

¶ 49    Additionally, in their brief on direct administrative review, the Schoffs make cursory references to a disparate-impact theory of discrimination. In a disparate-impact theory of housing discrimination, a complainant alleges that a facially neutral ordinance has the effect of discriminating against a protected class. *Anderson v. City of Blue Ash*, 798 F.3d 338, 364 (6th Cir. 2015). Under this theory, it is not the intent of a particular government entity that matters, but rather "the broader effects of the disputed housing practice" or ordinance. *Hollis v. Chestnut Bend Homeowners Ass'n*, 760 F.3d 531, 539 (6th Cir. 2014). To the extent that the Schoffs raise a disparate-impact theory on direct administrative review, it fails because, as the Commission

observed, this theory was raised for the first time in their request for review. As a result, the Commission did not have jurisdiction to consider the theory. See *Kalush v. Illinois Department of Human Rights Chief Legal Counsel*, 298 Ill. App. 3d 980, 991 (1998).

¶ 50    In their reply brief, the Schoffs argue that a recent circuit court ruling in their separate lawsuit, which alleges claims under federal law, the United States Constitution and the Religious Freedom Act, constitutes a "change in the law" which requires us to remand this matter to the Commission. However, neither of the cases cited by the Schoffs support this argument nor their requested remedy. Accordingly, we reject it.

¶ 51    Lastly, the Schoffs argue that, because the Department's investigation failed to properly analyze their claims of religious discrimination to include whether they were discriminated against based on their religious observance and practice, the Commission should have used its authority to obtain additional information to reach its decision on their request for review. Under the Act and its regulations, the Commission has discretion to further investigate factual matters underpinning a request for review (see 775 ILCS 5/8-103(B) (West 2020)) or obtain additional information to aid in its consideration of a request for review. See 56 Ill. Adm. Code § 5300.470 (1981). Here, there was a complete lack of any evidence that the Village subjected the Schoffs to discriminatory terms or conditions on the basis of religion, or harassed them on the basis of religion, or that the septic code amounted to an unlawful restrictive covenant on the basis of religion. Because of this lack of evidence, the Commission did not need to exercise its discretion to investigate the Schoffs' charge of discrimination further or obtain additional information to aid in its consideration of their request for review.

¶ 52                                   III. CONCLUSION

¶ 53    For the forgoing reasons, we affirm the decision of the Commission.

¶ 54    Affirmed.